All right, that brings us to Cotriss v. City of Roswell. And Attorney Keebaugh, whenever you're ready, you may proceed. Okay, can you hear me okay? Yes, thank you. Okay, well, thank you, Your Honor. May it please the Court, this is Reagan Keebaugh. I'm here on behalf of the appellant in this case, Sgt. Sylvia Cotriss. One issue before you in this appeal is whether the District Court erred in rejecting Sgt. Cotriss' claims under the First and Fourteenth Amendments very early on in this case on the ground that such claims were futile. The District Court offered two reasons for rejecting these claims. Both of those reasons are incorrect and require reversal by this Court. First, the District Court incorrectly held that a property interest in continued employment is required to state a claim for denial of due process. The Fourteenth Amendment's Due Process Clause protects against more than deprivations of property interest. The actual language of the Fourteenth Amendment is that no state shall deprive any person of life, liberty, or property without due process of law. So we see that the express language of the Due Process Clause protects against deprivations of liberty interest in addition to deprivations of property interest. Now, in her proposed amendments in this case, which the District Court held were futile, Sgt. Cotriss alleged a violation of her due process through the deprivation of her liberty interest in free speech. Now, while the District Court did not believe that this claim was viable, the U.S. Supreme Court has opined otherwise. And I would direct the Court's attention to Perry v. Sinderman and its companion case, Board of Regents v. Ross. In those cases, the Supreme Court recognized that a due process violation can stem from either a deprivation of a property interest or a liberty interest, such as free speech. Now, Perry and Ross both involved college professors who alleged that their contracts were not renewed in retaliation for their free speech. And in both cases, the Supreme Court recognized that deprivation of a liberty interest in free speech can be the basis for a due process violation in the same way that the deprivation of a property interest in employment can give rise to such claim. Now, in the section of Ross, where the Court discusses whether there's a liberty interest at stake for the purpose of establishing a due process claim, the Supreme Court wrote, to be sure, the respondent has alleged that the non-renewal of his contract was based on his exercise of his right to freedom of speech. But this allegation is not before us. The District Court stayed proceedings on this issue, and the respondent has yet to prove that the decision not to hire him was, in fact, based on his speech activities. So in both of those cases, we see just because of the procedural process or the procedural posture of the case and the way in which it came to the Supreme Court, the plaintiffs have not yet demonstrated that their speech was the motivation for their non-renewals. But the Supreme Court did recognize that free speech is a liberty interest protected by the 14th Amendment. Now, in its order, the District Court incorrectly, in its order here, the District Court incorrectly interpreted Perry as standing for the proposition that a property interest in employment is required for a due process claim. But that's not a correct reading of Perry. Perry and Ross both actually support the appellant's position here that deprivation of a right to free speech can give rise to a due process claim under the 14th Amendment as a deprivation of a liberty interest. Now, the Ninth Circuit's decision in Cohen versus San Bernardino Community College also supports the appellant's position. Now, like it did with Perry, the District Court, in its order here, distinguished Cohen on the sole ground that Cohen was a tenured professor and therefore had a property interest in his job, unlike Sergeant Kotras. But Cohen did not allege a deprivation of a property interest in his job. Rather, he alleged a deprivation of a liberty interest in his job, as Sergeant Kotras attempted to do here. The Ninth Circuit's opinion in Cohen even states that Cohen asserted that his First Amendment rights had been violated. It didn't state that he was asserting that his property interest in his job was, that he was deprived of a property interest in his job. Additionally, because the discipline at issue in Cohen... I'm sorry to interrupt, counsel. This is Robin Rosenbaum. I thought that the Ninth Circuit specifically said that it was not addressing Cohen's due process claim. Well, and that's a separate... So, the decision in Cohen, and as the appellees have pointed out, it's not entirely clear what the court was specifically addressing in Cohen. I would assert that Cohen establishes that there's a fair notice requirement in both the due process clause and in the First Amendment. Like, those are independent requirements of fair notice. Now, the court in Cohen wrote what it wrote. It wrote, I mean, in its conclusion, the court in Cohen even wrote, we reverse in part that aspect of the district court, which held that the imposition of discipline upon Cohen did not violate the First Amendment. It very well may be, though, that the district, the appellate court in Cohen, the Ninth Circuit intended to write that the fair notice came from a deprivation of his freedom of speech in violation of the 14th Amendment. But the court wrote what it wrote. It wrote that there was a violation of the First Amendment through that deprivation of fair notice, through the lack of fair notice. So, we've brought, I mean, we've asserted alternative arguments that there's a fair notice requirement both in the 14th Amendment due process clause and in the First Amendment itself. So, going back to Cohen, were there any further questions on that issue? I don't have any. You can proceed. Okay. So, you know, in Cohen, Cohen was not fired or non-renewed. So, he was required, and the discipline that was at issue in Cohen was that he was required to explain his teaching style in the class syllabus, to take a sensitivity class, and to be sensitive to his students. So, the discipline at issue in Cohen did not implicate his property interest in his job. It implicated his right to freedom of speech. And that is specifically what Cohen alleged that he was deprived of, was a liberty of interest in free speech. So, the second reason that the district court denied Sergeant Cotras' amendment as futile is that her fair notice claim was duplicative of her free speech retaliation claim. Now, Cohen also demonstrates that this conclusion is wrong. In the Ninth Circuit's opinion in Cohen, it wrote, we do not decide whether the college could punish speech of this nature if the policy were more precisely construed by authoritative interpretive guidelines, or if the college were to adopt a clearer and more precise policy. Rather, we hold that the policy is simply too vague as applied to Cohen. So, this language demonstrates that a denial of fair notice claim is distinct and separate from a free speech retaliation claim, and either claim can exist independently of the other. For example, in Cohen, even if the fair notice had been provided through more precise policies, it still would be possible for Cohen to assert a free speech retaliation claim if the restrictions on his speech were not permissible under Pickering. Now, Cohen raises, and this is an issue that I've discussed somewhat in my answer to your question, but Cohen does raise that second point that we've discussed in our briefing, and that is that there... Two minutes remaining. Thank you. That there is an independent fair notice requirement under the First Amendment itself. So, we know that Perry, Roth, and Cohen all involve speech by college professors, but these same standards also apply in the context of law enforcement. And the Seventh Circuit's decision in Vince v. Breyer is a very good example of when these standards have applied in that decision. The court analyzed the constitutionality of a very similar conduct on the Cumming policy to those that Sergeant Kotras was disciplined under in this case, and it concluded that those policies were unconstitutionally vague, both facially and as applied to the plaintiffs in that case who were all police officers. So, we know from cases like Perry, Roth, Cohen, and we're not futile as a district court. Let me ask you a question about the council, if you don't mind. We have this case called Davis, which was a non-bank opinion issued out of the old Fifth Circuit, so it's binding on us. And we addressed a policy where a fireman had spoken out and criticized the fire chief, and the policy said that you should not engage in conduct prejudicial to good order. And we upheld that language, and in the process of doing so, we said that it was very similar to the conduct on the Cumming language that had been analyzed in other cases and had been upheld. Why are we not bound by that? This is why, and just so I'm sure, is this 617 F. Second, 1100? Yeah. Okay. So, that's, and I submitted that case as part of our supplemental authority yesterday, and it's one where I had to read this case a few times to get what, you know, what the court was saying, but you're correct. This is a binding decision on this court, and I would point out that the decision in Davis versus Williams held that it was only addressing the facial validity of the statute. And if you look at, this is, I'm reading from page 1105 of that decision. It says, the court wrote, and as we have noted, the city authorities wisely did not bring to us the issue of whether the ordinance as applied to punish these was infirm or whether the specific provision against derogatory statements or adverse criticism was valid either factually or as applied to Mr. Davis. So, in that case, you're dealing, the decision in that case was holding, well, it was deciding that the facial challenge to the statute failed, correct? But the court specifically wrote that the city wisely did not bring to the court an as-applied challenge, right, insinuating that it would, had that challenge been brought to the court, it would have failed. And in this case, Sgt. Kochberg is not asserting a facial challenge to the policy that she was disciplined under. She's asserting an as-applied challenge, and the analysis of those two, there's a significant difference when it comes to analyzing an as-applied challenge versus a facial challenge. And I'll be happy to answer any further questions that the court has, but I would respectfully reserve my remaining time for rebuttal. All right. Thank you, counsel. Thank you. We'll hear from Attorney Dean. Good morning, Your Honors. I'm Brent Beene, I represent the appellees in this matter, City of Roswell. Let me pick up with issue number one, as I'll call it, which is the motion to amend, and then I also want to talk, more importantly, about issue number two, which is the free speech retaliation claim under Pickering. So, with respect to issue number one, the plaintiff moved to amend her complaint at the beginning of discovery, and Judge Cohen reviewed this under Rule 15 and Foman v. Davis, and the futility, of course, is judged under Rule 8, and whether such a claim can survive the standard under a motion to dismiss, which is Iqbal and Twombly. And so, what she pled, which is completely different from what she's now arguing, but what she pled was a failure, a due process claim under the 1st and 14th Amendment, a due process claim under the 5th and 14th Amendment, and a wrongful termination in violation of the 1st Amendment. That's what her proposed amended complaint was. It was not what is referenced. This is Judge Lagoa. Isn't that what she pled was the fair notice doctrine encompassed in the due process notion of vagueness? Yes, but she pled it as due process. And so, analyzing her complaint as pled, which is what Judge Cohen had to do, clearly the 5th Amendment claim was out, because there are no federal actors in this case. The SEC v. Fox has nothing to do with it. The wrongful termination claim was duplicative. It was already stated in her original complaint. It was a 1st Amendment retaliation case or claim. I'm reading from it on page 8, or excuse me, page 10 of her amended complaint. Wrongful termination in violation of the 1st Amendment, terminating her employment based on her free speech. She'd already articulated that. So, we're left with a 14th Amendment due process claim. And so, what that has to be is either a procedural or a substantive due process claim. She's admitted in her briefing and goes to great lengths to tell us that she has no procedural due process claim, because she has no property right in her employment. What she claims in her reply brief is instead that her due process claims arise from the city's infringement on her free speech rights. This is a would-be substantive due process claim. However, this fails for two reasons. One, under McKinney v. Pate, there is no substantive due process in public employment. That's 20-3-1550. This court held that en banc in 1994. Secondly, she's already articulated a 1st Amendment claim. And under the Supreme Court case of Albright v. Oliver, the more particular claim under the specific constitutional provision and not some notion of substantive due process controls. And in fact, the appellant has provided no cases where you have a 1st Amendment claim in tandem with a substantive due process for violation of a liberty, interest, and free speech. Albright held, in particular, that where the amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, and not the more generalized notion of substantive due process, has to be the guide for analyzing the claims. Now, I recognize that the plaintiff has come in here and talked about facial challenges and as-applied challenges, but if you look at the facts that are alleged in her proposed amendment complaint, none of that is apparent. Typically, in a case where there is a vagueness claim, you would find facts that are alleged, such as the undefined terms in the ordinance or the policy. The appellant didn't do that. You might find facts regarding the lack of you would expect to find facts regarding the subjective or arbitrary enforcement. Those aren't there. And you might find an allegation that says persons of ordinary intelligence have to guess at the scope and meaning of this policy. That also was not there. Neither did she allege that others interpret the policy differently. So, there really weren't any facts for the court to let's not talk about the confederate flag, but if a police officer in the Roswell Police Department wants to fly a black and blue flag in front of their house and they have a patrol car in front of their home, is that considered conduct and becoming of an officer? So, I'll answer that in two different ways. First of all, this kind of case, of course, begs for hypotheticals. It's reminiscent maybe of a law school examination question in some respects. This is not a law school examination. Just answer the question, please. Yes, ma'am, I will. Of course, that's not the fact that we have in front of us today that this court has to decide. And so, what I would tell you is the problem in this case under Pickering. Yes, ma'am. Yes, ma'am. I don't think it lends itself to a yes or no answer. But I'll answer the question. Does an officer know what is conduct and becoming of an officer? What flag can an officer fly in front of their home? Can they fly the American flag? Some people believe the American flag is racist. That's correct. And so, what I would say is that analysis is contained in the Pickering. And the problem in this case is that she associated a divisive flag with the City of Roswell Police Department. And she did it in a context at a time in which she admittedly endangered her fellow officers. Counsel, let me make this easy for you. When I speak, you're quiet and let me ask the question because this oral argument is not going to go smoothly if you don't allow me to ask my question. Okay? Yes, ma'am. If Ms. Kotras did not have a police car in front of her home for four and a half months at the time that the report or complaint was made, how did someone know that she was a police officer? Is the fact that she just had the flag out in front of her home sufficient in and of itself? Or is it because there was a police car at some point in time? It is because there was a police car at some point in time. The key here is the association with the flag and the Roswell Police Department. So, can a police officer have a Confederate flag inside their home? All things being equal, probably so. It just depends on the facts and circumstances. But if there's no association with the flag and the Roswell Police Department, then the manner in which that flag is displayed is not objectionable. If a person complains and calls the chief of police now, which is Chief Duncan, and they say, you have a police officer who is flying the black and blue flags, and I think that that's inappropriate, would that person be subjected to conduct of becoming an officer? Well, I would say the answer to that is no, based on the facts that you've laid out, because the black and blue flag does not have a history of being divisive. Well, I believe that some people believe at this moment in time that the black and blue flag is not necessarily supportive and supportive of the police department in a negative way to the African American community. Well, I understand that, but I don't think the standard is whether somebody's offended by the flag, right, under Pickering. I mean, again, you can say that- I'm sorry, go ahead. If someone is calling the chief and saying, I'm offended by that flag, or I'm offended by the fact that there's a Roswell Police Department car that is flying the don't tread on me flag. I'm sorry, what's your question? Is that conduct, then, of becoming of an officer? How does an officer know what is conduct on becoming of an officer? By virtue of the policies in the handbook, which say don't engage in conduct, which- Let's look at the conduct, because under 1682, which is conduct on becoming on off-duty conduct, examples of such conduct will include, but is not limited to the following. If you look at them, they all deal with either some type of fraud or some type of crime or some type of falsification. It's literally some type of insubordination or concealment or engaging in notorious or disgraceful conduct that affects the city's interests or insubordination, fighting during work time on city property, misusing city funds, falsification of city records, fraud in securing employment, conviction of any felony or misdemeanor involving moral turpitude, instigation of a strike, sit-down, stay-in, sympathy strike. I mean, if you look just at the examples, I understand it's not limited to these examples. These examples all suggest that it's conduct that is in a way that involves fraud or crime or insubordination or something other than asserting your First Amendment rights. You would agree that flying a flag does constitute a First Amendment right? Generally speaking, although I don't concede that in this case, but I'll tell you all of those examples, and you're right, you can't lay out every single one of them, nor do you have to as a matter of law, but all of those examples deal with affecting trust and affecting the ability of the police department and their positive relations with the community. I mean, these are people that can take away somebody's liberty, and if there's a belief that they are acting fraudulently or that they have some racial bias, that's the reason those examples are in there, and that's the reason why associating a divisive symbol like the Confederate flag with the Roswell Police Department is conduct unbecoming. Well, again, how do we know that flying the American flag isn't conduct unbecoming? Because some people, again, believe that that stands for a racist systemic injustice. Well, I would suggest to you that those people are in a very small minority, and there's not a long history of that flag being associated with divisiveness. Was it also not the case that with respect to the incidents that had been occurring, they were discussed in meetings of the entire staff and officers were put on notice of what was going on if they somehow missed what was going on over the news and in public and in the streets? Yes, ma'am, that's exactly correct. I mean, that goes to this whole notion that somehow she was surprised by this. Was Sergeant Kotras on medical leave since March? So, she was on leave for almost five months during that period of time and was not in the department and in those meetings? The answer to that question is that both are correct. She did receive department bulletins, and yes, she was on leave for a period of time, but this was not something that just arose after March. Two minutes remaining. So, she, look, I mean, she's a sergeant. She was a supervisor. She had 20 years experience. I mean, this is, it's not a close call for her. And yes, she received that. I mean, three days before this incident was reported, police officers were shot in Dallas because of racial tensions. And is this court going to tell the city of Roswell they can't discipline an officer for flying a racially divisive flag above her Roswell police car? But again, her Roswell police car was not there, correct? So, the complaint that you received was, in fact, partially incorrect. I disagree with that characterization. The complaint was dated, but obviously he saw it, or he wouldn't have reported it. I don't think he made it up, and furthermore, she admitted it. Well, I understand that, but when you read the email that was sent, it specifically says, I went to the meeting in Eagle's Nest Church, and I was walking afterwards. The next day, I was walking my children to preschool, and I noticed a police vehicle in front of a car with a Confederate flag outside. That's what it said. So, the point is, is that there was no police vehicle, and there had been no police vehicle there since March 31st. That is correct, but whether he mixed up the dates or not, I don't think there's any question. I mean, she's admitted she parked her police cruiser under this flagpole with this flag for some period of time, and clearly somebody saw it. Counsel, let me ask you this. Suppose the flag had said, Blue Lives Matter. Could the city discipline her for that? Well, again, this goes to a hypothetical that's not in front of us today, and presents a different question, but I would say this. Counsel, counsel. Yes, sir. Don't ever answer a question of, that's not the fact of the case. Anybody who's read the briefs and the opinions knows that. It's a hypothetical. It's meant to ramifications of them. Now, if she had run a flag up the pole and parked her cruiser under it that said, Blue Lives Matter, could you retaliate and fire her or discipline her? Yes or no, it's relatively simple. I would say no. All right. And I would say there is not a history associated with that type of statement and that flag such as it is, as there is with the Confederate flag. Well, what about a flag that said, White Lives Matter? I think that gets closer to where we are in this case. I know. That's why I ask it. My question is, could you discipline her for that? I would say possibly. I think that is a, it affects the same issues in associating the Royalty Police Department. Do you think the fact that you, immersed as you are on this issue and ready to discuss it and cognizable of all the decisions on it, have to answer that question with possibly, doesn't that indicate some vagueness in the standard? I don't think so. Then why can't you say yes or no instead of just possibly? Because it is a, the pickering test is a balancing one. And so there are very few bright lines here. So, but I would say that implicates the same problems as the Confederate flag is racially divisive and it associates that divisiveness with the Royalty Police Department. And in a context, and this is what's important, in a context like what's going on at the time, and I would say even today, it's dangerous for her to make a racially divisive statement and associate it with the Roswell Police Department. Counsel, this is Rob. Let me, if I could, I would like to ask, what if a Nazi swastika flag was becoming, if it were flown constantly for over a year next to a police cruiser? I don't think so, because there's a, there's a, there's a history of that. Everybody knows what the Nazi, what the Nazi flag stands for. Okay. And so that's, that's being the case. Is this a question of, and as a Clyde problem, possibly, but not, in other words, do we have to look at the specific facts that are involved? And so it might be vague with respect to a flag like Blue Lives Matter or something to that effect, but it might not be vague with respect to other flags that definitively would identify the department with racist thinking. I completely agree with that, especially given the context in the time in which it was flown. May I ask you another question? I think it was Chief Grant in his declaration said that she would have been allowed, he would not have terminated her for flying the Georgia flag. Do you recall that? I do. Okay. Well, let me ask you a question. Would she have been terminated for flying the Georgia flag that was pre-2003? Assuming that she was flying it at the time or flying it today? She was flying it at the time. No, that was the state flag of Georgia. And it's, I don't think one could read- No, not the current, not the current flag. I'm talking about the pre-2003 flag that had the confederate- Right, I understand. The one that contains the, the confederate battle anthem in the corner. Correct. Yeah, I don't think so. It was the sanctioned state flag of Georgia at the time. I don't see how she could be disciplined. Even though it had the confederate symbol on it? Even though it had the confederate symbol. I mean, you're talking about her flying it when it's the state flag of Georgia. I think today that's a different question. Counsel, did you have anything further? Oh, I'm sorry. I thought I was waiting for a question from you. Yes, ma'am. I would say along these lines that the key- look, I mean, you're dealing with a police department, right? So the ability of the police department to regulate their employees' speech is much greater than some other government employer. Even government employers have a greater ability to regulate their speech. I mean, Conant v. Myers, for example, this circuit is held in Hansen v. Soldenwagner that a police, as a paramilitary organization, has to be given more latitude because of their unique need to maintain the trust of the citizenry. I mean, that's exactly what we're talking about here. And so in this case, why this case is so egregious, why her conduct was so inflammatory and dangerous is because she associated a divisive, a racially divisive symbol with the police department. And she did so in a time during heightened racial tensions, and she admitted in her deposition that that conduct, or at least her omission in allowing that conduct, may have increased the danger to fellow officers. I don't see how this is a close call under Pickering. Now, there are many permutations and hypotheticals that get closer to the line, but here I don't see that her interest, such as it was under the First Amendment, comes anywhere close to the city of Roswell's interest in maintaining and running an effective police department with the trust of the citizens over whom it has power to deny their liberty. With that, I yield the rest of my time, and I would stand on the briefs that have submitted, and I thank the panel very much for their questions. Thank you, counsel. We'll hear from Attorney Kubot. Thank you, Your Honor. The panel's questioning in this case highlights the importance of the fair notice doctrine and also the reason why this case should be reversed because the court refused to permit Ms. Sgt. Kotras from adding those claims to her complaint. I asked these very same hypothetical questions to the city administrator during her deposition. I would ask her questions like, you know, if a city grounds worker came to you and asked, can they display the Confederate flag, you know, on a flagpole in their front yard, her response was that she would tell them that they should just use their best judgment and always err on the side of caution, right? That's a constitutionally untenable situation that we have at the city of Roswell, where you've got a city that is clearly intent on regulating speech in this area, but they're really just refusing to tell their employees what they can and can't do. So the result of that is a whole bunch of suppression of speech that may not be constitutionally suppressionable, right? You've got employees who simply won't engage in speech that they might be able to constitutionally engage in for fear of being subject to discipline, up and including termination. The way that this court can correct that problem, this court doesn't have to tell the city of Roswell that you can't regulate speech in this manner. This court should do exactly what the Ninth Circuit did in Cohen. You tell the city of Roswell that you can regulate speech, but if you're going to do that, you've got to do it with precision. You've got to announce rules and policies that specifically tell your employees what they can and can't do. That allows the employees, then, if they feel like it's necessary to challenge those policies, they can bring claims in the district court. The district courts will- Counsel, in these racially charged times, how would you phrase that very specific constitutional standard you're talking about, specifically with race in mind? I would do exactly what every branch of the military has recently done. Just recently, the Marine Corps has issued a policy that says no officer or enlisted servicemen in the Marine Corps may display the Confederate flag on Marine Corps property. Something similar to that, in this case, would be something like- That brings up an important question. I would say restrict it to the police department and say no employee of the city of Roswell Police Department may display the Confederate flag or Confederate emblems either at home- You can always take the facts of a particular case and articulate them into a rule and say, that would have been easy. But what about the white life matter flag? How would you cover it? Well, I don't know. I would admit, yes, it's hard to come up with an all-encompassing rule, but that's why- Well, what that may indicate is that it's impossible to comply with your standard and achieve a purpose that we all recognize is legitimate. Well, that depends on what the city intends on restricting, because I didn't ask that hypothetical to the city administrator, but it could be that the city doesn't intend to restrict their employees from displaying a black lives matter or a white lives matter flag. But in this situation, you've got other entities, and we've cited the cases in our pleading, but other cities have found it necessary to come up with policies that explain to either their employees or their law enforcement officers what they can and can't do with respect to the Confederate flag. Here, this is a situation that's very similar to Cohen, where you've got an officer who engaged in conduct that she- I understand the sentiments of the city and the need to restrict the speech, but I also understand that not everybody has the same worldview as me, and not everybody's had the same opportunities as me to go and broaden your mind and understand these sorts of nuances. And as we've pointed out with our expert opinion that was presented to the district court, it's not clear that the average law enforcement- you know, most law enforcement officers may not realize that displaying the Confederate flag in this manner would amount to conduct unbecoming, right? So that's the importance of telling them. If you're going to restrict the speech in that way, tell them. Have a rule. They can challenge that rule. That rule can then be subject to pickering, but you don't get to pickering unless there's fair notice, unless the governmental employer has told its employees that you can't do this. And I understand what the- you know, you've got- there's a lot of people out there, including myself, who completely understand why a city would not want their law enforcement officers to do this, right? And this- Counsel, I'm sorry to interrupt. This is Robin Rosenbaum, but let me ask you the same question I asked your colleague, and that is, would the city have to specify that officers can't fly the Nazi swastika flag at their home associated next to a police vehicle? I would say if they're going to go about announcing a rule like this, they should include as many but that- I guess my question is different. My question is different. Would you say that an officer did not have fair notice by the conduct unbecoming that she could not fly the Nazi swastika flag on a 15-foot flagpole above her house on a very busy road displayed right next to a Roswell City police cruiser? I would say that that would- that can be considered conduct unbecoming, but the answer to that hypothetical and my answer, though, highlights the need for fair notice because- Yeah, but- well, Counsel, before we highlight something, why is that conduct unbecoming, but Confederate flag flying over a police cruiser is not? Well, I think it's because society has widely understood that it's unacceptable to- for a police officer to display the Nazi flag for- But it's not widely understood that it's unacceptable for a police officer to fly a Confederate flag, battle flag as it is, in a time of heightened racial tension. Well, the case that we cited in our briefing, which was Greer v. City of Warren, that's a 2012 case in which a district court found that that conduct was constitutionally protected as free speech and that it could not be regulated under Pickering. So societal norms change. So 10 years ago, maybe it was okay to do this. Now, it's probably not. But that, again, is the- that norms of what's acceptable speech and what's not changed continuously. Well, let me ask you- let me ask you a question. This is Judge Begoa because you're talking about changes in societal norms. So let's talk about a religious symbol. So someone- let's say a police officer wants to have a religious sign that indicates their particular religion or that they attend a particular church. Let's say they attend a church and they're going on their way to church in the patrol car. They stop on Sunday. They're not yet on duty, but they're on their way after church to go to become- to go on duty. And that church is associated with a particular political speech, whether it's anti-American or it's homophobic. Would that be considered something that would be unbecoming of an officer? Because society changes. So you're talking about societal changes in norms. I mean, I would say no to that hypothetical that that would not be considered conduct unbecoming. Now, that's not to say that a public employer could attempt to regulate that type of speech or that type of association or that whatever constitutional right you want to call it. But conduct unbecoming, I would say no. And I'll point out also that there are ways in which a public employee could display the Confederate flag that I think would clearly be conduct unbecoming, where, you know, for example, there's context that you could display it in, where if you're at, you know, a rally associated with a hate group, or if you display the Confederate flag along with a message that clearly ties your purpose for displaying it to the negative connotations of the flag, right? So those, you know, that's not the fact. In this case, though, we have a maybe the city can prohibit this, right? But what she's doing, she's displaying the Confederate flag on a flagpole beneath the United States flag. We've pointed out in our briefing, that's like the state of Georgia to this day engages in identical speech. If you go to Stone Mountain Park, they display the Confederate flag directly next to the US flag. And the reason I could be about whether doing that same thing... But isn't that different? Isn't that different, though, because they put it in the context of the role of Stone Mountain Memorial to the Confederate War, right? I mean, isn't it sort of a historical context that it's put into? It is, yes. I mean, the whole park, Stone Mountain... Put it into a historical context? Well, she put it in... I mean, no, but she displayed it in a similar manner, right? And the reason I bring that up is that, again, this is the context in which she had to make that decision of whether doing this would be considered conduct unbecoming, right? So she's got... I mean, just until this most flag, you know, it's not there anymore. But that's just another example of societal norms changing. And because societal norms change, if you got to do what the Supreme Court has said, if you're going to regulate speech, you got to do it precisely. You've got to tell your employees exactly what they can and can't do. Let them challenge that. And here, if the court does what I'm proposing, do exactly what the Ninth Circuit did in Cohen, you tell the city of Roswell, you can regulate this speech, do it precisely, come up with rules... But Cohen is different. It's not... I mean, you don't have officers whose lives might be at risk, you know, if they're associated with a Confederate flag and the racist biases that many people feel the Confederate flag stands for. I mean, in the Cohen situation, it's the that professor does or doesn't do isn't going to affect the safety and security of the other professors at the campus. I mean, this seems like it's different. Why is it not different? Well, if we're going to get to the pickering step of this case, like where you're talking about, you know, what the city's interests were in prohibiting this speech, you've got to keep in mind that, you know, number one, she did this without fair notice. Number two, you know, the car was not at her home as of March 31st of 2016. Number three, she took the flag down immediately when the city raised the issue with her, told her about the complaint, she removed it. She didn't say, no, I'm going to continue engaging in this speech. We'd have a different case if that were the situation. So you've got to ask at that point in time, at the point in time when the city was making the disciplinary decision, they no longer had those safety concerns. The flag was gone. Her car was gone. There was no lingering threat of this flag because it was gone. There's no lingering threat of it potentially causing safety issues for the officers. And I'll point out too, in Chief Grant's deposition, I asked him whether the safety issue was, you know, a reason to justify terminating her for this. And he said no, that he wasn't concerned about that. You know, they were concerned, obviously, about the image that is the public image of the police department. But again, the city, this court can rule on this case without telling the city of Roswell that it can't prohibit the speech. It does, by doing what the Ninth Circuit did in Cohen, by recognizing that the district court improperly denied the motion to amend, that these fair notice claims weren't futile. Therefore, the city was required to provide fair notice. And you can't say under the facts of this case that she had fair notice that displaying the flag in the manner that she displayed it would be considered conduct unbecoming. All right, counsel, well, if there's nothing further, then we thank you. We've got your consideration. We'll stand in recess. Thank you. Thank you. Thank you both.